## DECLARATION OF KEVIN ALLEE

I declare under penalty of perjury that the proceeding statements are true and correct. My name is Kevin Allee. My date of birth is August 14, 1981, and my address is 21 Woodland Ct., Mansfield, 76063. I declare under penalty of perjury that the foregoing is true and correct.

1. Prior to 2020, the City of Fort Worth had its own set of game room permit regulations. However, in late 2019, Tarrant County decided that it wanted to take a more aggressive, standardized approach to regulating game rooms. As a result, it created the Tarrant County Game Room regulations to standardize licensure. The City of Fort Worth adopted Tarrant County Game Room Regulations ("Regulations") in 2019. Those regulations became effective April 1, 2020, by way of interlocal agreement with Tarrant County.

2. I own Plaintiff Pot of Gold ("POG"), which has operated a game room since 2019 under the relevant permits required by the City of Fort Worth and Tarrant County. While under Permit No. COIN-OPERATED_8558 ("'8558 Permit"), POG operated legally and made every attempt to comply with the Regulations.

3. We have a Texas Coin Operated Machine General Business License that expires 12/31/2025, a Texas Comptroller of Public Accounts (Machine Sticker) that expires 12/31/2025, a Tarrant County Game Room License that expires 5/14/2025, and an Amusement Machine Decal that expires 5/14/2025.

4. Our building lease expires 12/31/2027.

5. Fort Worth has been searching for ways to get rid of the POG game room since it began the process of re-applying for 2020 game room permit. On August 7, 2019, POG approached the City of Fort Worth to renew its permit and clarify what was necessary for the re-application process. During this discussion, the City of Fort Worth's agent tasked with assisting with such applications informed POG that since it had two lots, it could apply for two secondary game room permits instead of a single primary game room permit, which the employee asserted would be cheaper and faster.

6. Relying on the misinformation given by the city employee, POG applied for and obtained two separate secondary game room permits, one for each lot, which at the time were considered a form of certificates of occupancy.

7. While this re-application process was occurring, Tarrant County and the City of Fort Worth signed an interlocutory agreement adopting the Tarrant County Game Room Regulations as the standard regulations in both Tarrant County and more specifically Fort Worth.

8. After granting the two secondary permits, the City reversed course and revoked the permits in October 2019, stating in part that even though there were two lots, POG qualified as a primary game room, not two secondary game rooms. We asked to refund the money we paid for the stickers to put on our machines or the permit fee and the City did not refund the money.

9. At this point, the City considered POG to have been a secondary game room, even though it held those permits for less than a month and had operated a primary game room for a full year prior. Immediately, POG began inquiring to discover what it ought to do to regain its primary game room status. Because the City and Tarrant County were implementing the new Regulations, POG's inquiries as to the process went unheeded for multiple months as it bounced between the City of Fort Worth and Tarrant County, each claiming the other was responsible for game room certificates.

10. To rectify the situation, POG filed a new primary game room application, App. No. TGR20-0033 ("'0033 Application"), along with a request for distance exemption with the City of Fort Worth's Game Room Administrator as the City employee's new instructions requested. This application was denied because the City alleged POG is within 1,500 feet of a residential neighborhood.

11. Upon inquiring into the reason for denial, the City claimed POG had failed to file a timely application for a distance exemption and had previously been considered a secondary game room, excluding POG from obtaining the necessary primary game room permit.

12. POG appealed its denial to the Game Room Permit Appeals Hearing Officer, a process set up under the Regulations. This appeals process was fraught with Fort-Worth-created difficulties. Fort Worth scheduled the hearing in the Fort Worth Municipal Court for October 13, 2020 at 1:00 P.M., the final day an appeal could be heard on POG's denied application. At the time scheduled, only POG and his attorney appeared. Naturally perturbed by the lack of City representative, the Hearings Officer continued the hearing to 4:30 P.M. to allow for time for the City to provide a representative. Apparently, the City had neglected to give itself notice that the hearing it had scheduled was occurring. Upon reconvening the hearing, POG and his attorney and representatives from the City all appeared and the hearing proceeded as normal.

13. The Hearings Officer issued his Final Decision and Order reversing the City of Fort Worth's denial of POG's application and allowing POG to re-apply based on its '0033 Application on November 3, 2020, the final day to do so.

14. Following the Ruling, the City filed an appeal into the state district court. While the appeal was ongoing in 2021, Fort Worth police raided the POG game room, arresting employees for operating an illegal game room. FWPD issued citations to the employees despite the order from the hearings officer that allowed POG to continue operating. The citations were later dismissed.

15. In the appeals process, the City sought, without legal basis, to add evidence to the administrative record. POG objected and the Court denied the City's attempt. Undeterred, the City attempted to file a motion for summary judgment that the district court should, in essence, substitute its own judgment for the hearings officer as to the weight of evidence. The district court denied the City's MSJ as to reversal. Finally, the City sought to appeal

to the Appellate Court. After this point, the parties settled, and POG has operated within the bounds of the regulations ever since.

16. Up until 2020, there were several recognized exceptions to the Texas gambling statutes. These included the fuzzy animal exception, which was a prize-based exception to allow games of skill or chance if there was a cheap prize. Additionally, the test for whether a game was considered a lottery, pure game of chance, or a game of skill, which were allowed, was more lenient. However, the Texas Supreme Court issued a ruling in 2020 that determined that 8-liner game machines fell under the games of chance exception.

17. The Court of Appeals in Fort Worth then followed up on this ruling with its own: the fuzzy animal exception was an extra constitutional exception such that game rooms in their current form are completely unconstitutional. The only game rooms still allowed by law in any form other than a carnival booth are bingo halls.

18. Piggy-backing off of the new regulations, Fort Worth determined in December 2024 that this was the time to get rid of game rooms once and for all. It passed Ordinance No. 27381-12-2024, which removed the regulations for licensing game rooms entirely. After it comes into effect, Ordinance No. 27381-12-2024 completely bars all game rooms within the City of Fort Worth. The text of the ordinance provides no grace period for game rooms to change business model or otherwise mitigate the massive impact that these regulatory changes have had. These actions are what resulted in this suit.

Executed in Tarrant County, State of Texas, on the 6th day of February 2025.

_____
KEVIN ALLEE



**CHRISTOPHER B. MOSLEY**
Section Chief, General Litigation

Direct Dial: (817) 392-7603
Chris.Mosley@fortworthtexas.gov

January 22, 2025

TO:
POT OF GOLD
5125 Sun Valley Dr
Fort Worth, TX 76105

Re:   Game Room/Amusement Redemption Machine Compliance Letter

In 2014, in response to citizen complaints about crime around game rooms, the City Council adopted two ordinances, licensing and zoning, to combat the problems residents were experiencing with game rooms in their communities. The City was sued upon the effective date of the ordinances, and after over nine years, the litigation has ended in the City's favor. In June, the Texas Supreme Court declined further appeals in *Stephannie Lynn Rylie, et al v. The City of Fort Worth and David Cooke, in his Official Capacity as City Manager,* leaving in place a Second Court of Appeals opinion holding that eight liners, referred to as amusement-redemption machines in our ordinances, are unconstitutional lotteries because they are games of chance.

As a result of the litigation's outcome, on October 15, 2024, the City Council adopted an ordinance amending the City Code to repeal the licensing provisions for amusement-redemption machines and game rooms. The City Council voted to approve the zoning-text amendment on December 10, 2024, to fully effectuate the ban of eight liners/amusement redemption machines and game rooms.

City records show that you possess an eight-liner also known as an amusement redemption machine. You are hereby notified that you must comply with the City's ban on eight-liners by removing them from the City by March 17, 2025. Failure to do so will subject you to enforcement actions including, but not limited to, injunctive relief, civil penalties, or criminal enforcement. Grandfathering does not apply since, legally, eight-liners/amusement redemption machines within game rooms are unconstitutional lotteries.

You should consult an attorney should you have any legal questions. Should you have questions related to this letter, please contact the undersigned. Should you have questions regarding the ordinances, please call Inkah Michelle at 817-392-6138. If you



Game Room Compliance Letter
January 22, 2024
Page 2

need to update your certificate of occupancy, please contact Support Services at 817-392-2222.

Sincerely,

*/s/ Christopher B. Mosley*
Christopher B. Mosley
Senior Assistant City Attorney
Section Chief, General Litigation

# COMMERCIAL LEASE AGREEMENT

**THIS AGREEMENT MADE THIS  _1st_ DAY OF _May, 2019_ BY AND BETWEEN  PA Scott Industries, (LESSOR) AND  Pot of Gold, LLC (LESSEE). THIS AGREEMENT IS SCHEDULED TO EXPIRE ON THE 31 DAY OF December, 2027.**

**PARTIES. This lease is considered an agreement between PA Scott Industries. (Lessor) and Pot of Gold, LLC ( Lessee) above.**

(a) The lessee agrees to rent a work space/ office space from the lessor for a period of 60 months, located at **5125 Sun Valley Drive, Fort Worth, Texas 76119**. The lessor agrees to notify the lessee within **15 days** of occurrence, if the above referenced lessor, ownership and/or management changes or the lessor elects to change any information related the above referenced property above in any capacity.

(b) The lessee agrees to pay a **monthly** rental fee in the amount of **$5000.00 on the 1st day of each month. This financial obligation expires on the date that this agreement expires. The rental payment is considered late after the 7th day of every month. All late payments will incur a late fee of $20.00 per day in addition to the monthly payment of $5000.00. The lessor will issue a Notice of Eviction to the lessee in the event that the monthly rental payment is 28 days late. Partial payments and payment arrangements will not be excepted, unless a prior arrangement is created between the lessor and the lessee which will only be considered valid if the arrangement is executed by the lessor and lessee. The monthly rental payment will only be excepted in the form of a money order and cashier check. Any other form of payment will not be excepted and will not be considered valid.**

(c) **The lessee agrees to pay the following ultilities for the duration of this agreement: water** and **electricity. The amount of financial obligation on the part of the lessee un reference to the above utilities is the responsibility of the lessee and should be submitted on the due date, form of payment and manner deligated by the respective utility companies. All disconnected or suspension of service regarding ultilities is the responsibility of the lessee ans should be resolved no more than 48 hours after service disconnection. All utility services disconnected, for non payment,  tampering and all other reasons, except natural disaster or city related, will be grounds for eviction and fees in the amount of $50.00 per day will incur and be added to the following monthly rental payment in addition to the scheduled monthly rental payment.**

(d) The lessee agrees to solely conduct daily duties, in the scope of his employment, at the above referenced property and refrain from sub-leasing any portion of the above referenced property, sharing the work space with any party(s) not mentioned in this agreement, engage in any activities or conduct that violates any state and local laws, ordinances and/or regulations.

(e) The lessee agrees to refrain from the possession of any illegal drugs or any activities involving these items and substances.

# COMMERCIAL LEASE AGREEMENT

(f) The lessee agrees to refrain from the possession or permitting any animal, of any kind type on the premises of the rental property included in this agreement.

(g) The lessee agrees to refrain from the storage of any vehicles, equipment and/or tools that are unrelated to the purpose and scope of his employment. Any unauthorized vehicles and equipment will be removed or towed at the expense of the lessee.

(h) The lessee agrees to notify the lessor of any employees and business personnel that will be present on the premises for the purpose of employment. All unauthorized individuals who are present on the property, and are not classified as a customer (person receiving services as described as a necessary action in the scope of the lessee's employment ) or employee(person reported to the lessor as such) will be asked to leave and or will be escorted from the premises  by the local authorities or by bonded security personnel.

(i) No children or individuals under the age of 18 will be permitted on the premises in which the lessee is conducting business. The customers of the lessee will not have access to other areas of the property, mentioned in this agreement, that is not designated as the lessee's rented work space.

(j) The lessee is responsible for the daily upkeep of the area that is being rented from the lessor. The daily upkeep and maintenance includes, but not limited to, cleaning, keeping the area free of trash, debris, environmental waste, human waste, food and any other items that are not considered machinery or free standing structures related to the scope of employment. All chemical waste fluids should be cleaned up properly and in compliance with the local and state environmental regulations. Any violation of this obligation will result in the lessor hiring professional services to clean or remove debris, fluids etc. at the expense of the lessor. The lessor will be obligated to render monetary reimbursement immediately upon entering the premises or the next day following the professional cleanup, whichever occasion proceeds.

(k) The lessee agrees to keep the rented work area clear of all excess equipment, vehicles etc. that is not being used in the scope of employment on a daily basis or that is unrelated to the purpose of the lessee's business practices. Any abandoned equipment, vehicles or property will be towed away from the rented space at the expense of the lessee or a mechanics lien will be filed against the abandoned property by the lessor in the amount determined by the lessor.

(l) The lessor will maintain access to the rented space or area at times and will issue the lessor (1) copy of the assigned key for the purpose of entering/exiting and ultilizing the property for the purpose of employment and conducting business. The lessor will retain a copy of the key to the rented area/space at all times. If the lessee is locked out or is unable to access the rented area/space due to not having a key or misplacement of a key the lessor will have new keys made, notify a locksmith or perform necessary methods to regain access to the property at the lessee's expense.  The lessee agrees that the only individuals authorized to possess a key, gate remote control or any instrument intended to access entry into the rented area/space is the party(s) involved in this agreement. Any unauthorized person on the premises, regardless of the

# COMMERCIAL LEASE AGREEMENT

    possession of a key or access tool, will be subjected to actions of the local authorities on the basis of trespassing, and/or breaking entering  etc.

(m) The lessee agrees to notify the lessor when unusual or later hours will be maintained for the purposes of conducting business. Otherwise, the lessee agrees to maintain hours at the maximum rate practiced by the administration offices located at the entry of the rented property. If later houra will be observed, it is the lessees responsibility to notify the lessor of the requested hours upon observation of those hours.

(n) Lessee agrees to maintain or utilize the rented area/space for all business related files and property. The lessee is not authorized to use the administration offices of the lessor to conduct business practices, maintain documents or files or to communicate with clients in any capacity. The lessor is not responsible for stolen or missing documents or property belonging to the lessee.  The lessee agrees to maintain the responsibility of providing their own computer access and is prohibited from ultilizing  the office computers or technology owned and operated by the lessor.

(o) The lessee agrees that execution of this agreement relinquishes the obligation and responsibility of the lessor to provide any financial assistance to the lessee in the event of injury, accident or death. The lessee agrees to conduct business practices at their own risk and according to the guidelines of safety implemented in their specific industry, genre or area of profession.

(p) The lessee agrees to abide by and remain in this agreement for the period which is illustrated in the introduction of this agreement. The lessee agrees to pay the remaining balance of this agreement if early termination, eviction or abandonment is performed by the lessee in terms of this agreement. All unpaid proceeds will be filed with the local court for a judgment heading the uncollected proceeds.



**LESSOR _____PA Scott Industries _(electronically executed)_____**
**DATE_____05/01/2019_____**


**LESSEE___KEVIN AILEE/Pot of Gold, LLC____(electronically executed)_____ DATE____ ____05/01/2019_____**